# Exhibit A

4/14/2023 4:59 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 74679254
By: Monica Jackson
Filed: 4/14/2023 4:59 PM

CAUSE NO. _____

| | | |
|---|---|---|
| JANE DOE (A.S.), a pseudonym, | § | IN THE DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| WYNDHAM HOTEL & RESORTS, INC. | § | |
| *Defendant* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, Jane Doe (A.S.) Plaintiff in the above- styled and numbered cause, and files her Original Petition complaining of Wyndham Hotels and Resorts, Inc. (hereinafter referred to as "Wyndham" or "WHRI"), as Defendant, and would respectfully shows the Court and jury as follows:

### I.    SUMMARY OF THE CASE AGAINST WYNDHAM

1.    Jane Doe (A.S.) files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of sex trafficking. Wyndham owns and operates hotels under the name of Days Inn. Plaintiff alleges that the Wyndham Defendants knowingly benefitted financially from participation in a venture when Wyndham knew and/or or should have known the venture was engaged in trafficking in violation of 18 U.S.C. § 1595.

2.    Human sex trafficking is a pervasive evil that has left an indelible stain on the fabric of society. This conduct is undoubtedly one of the most wicked and immoral forms of behavior to plague civilized societies.

3.    As sex trafficking has grown to epidemic proportions, it has become widely recognized that our laws must look beyond the direct trafficker and sex buyer to end sex trafficking.

4.    Congress thereby enacted the Trafficking Victims Protection Reauthorization Act and its reauthorization amendments ("TVPRA").[1] These statutes expanded civil liability beyond the direct

---

[1] 18 U.S.C. Chapter 77; *see generally* United States Department of Justice, Human Trafficking-Key Legislation (Jan. 6, 2017), link at Human Trafficking-Key Legislation.

individual traffickers to provide a civil remedy for trafficking victims against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known" was engaged in trafficking.[2]

5. The case is about the continuous sex trafficking of Jane Doe (A.S.). Jane Doe (A.S.) was the unfortunate victim of a scheme that began with criminal traffickers, but was assisted, supported, and/or facilitated by Wyndham and its associates.

6. Hotels exist to make profits, and trafficking increases revenues for any facility willing to tolerate this depraved behavior. Traffickers know that some hotels rarely intervene even in the face of openly illegal behavior. The industry and its component members must be held accountable for their role in the expansion of sex trafficking in the United States.

7. Wyndham, the Defendant named in this lawsuit violated federal law by obtaining financial and other benefits as a result of participating in a venture they knew or should have known was engaged in a venture in violation of 1591.

8. Thwarting the expansive growth of human trafficking requires society to hold accountable those who knowingly profit from participation in ventures that a reasonable person knew or should know was engaged in various forms of human slavery. Thus, civil lawsuits are an essential component of a viable plan for combatting sex trafficking in America.

## II. JURISDICTION AND VENUE

9. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States, including the collective Trafficking Victims Protection Reauthorization Acts ("TRVPA"), 18 U.S.C. Chapter 77, specifically 18 U.S.C. §1595.

---

[2] 18 U.S.C. § 1591.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants resides in this district, and a substantial part of the events and/or omissions giving rise to this claim occurred in this District and Division.

### III.    PARTIES

11.     Jane Doe (A.S.) currently resides in Arkansas. She was a victim of sex trafficking, which took place at a Days Inn at 10137 North Fwy, Houston, TX 77037 during the time period of 2008-2012.[3] Given the nature of these allegations, and in reliance on Texas law this Court's Order that permits use of a pseudonym, this complaint identifies your Plaintiff as "Jane Doe (A.S.)" throughout. Jane Doe (A.S.) may be contacted through her lead counsel, whose information is contained below.

12.     Defendant Wyndham Hotels and Resorts, Inc., d/b/a/ Days Inn, is a Delaware limited liability company with its headquarters at 22 Sylvan Way, Parsippany, NJ 07054. Wyndham Hotels and Resorts, Inc. may be served with this lawsuit by serving its registered agent: Corporate Creations Network, Inc., 3411 Silverside Rd, Tatnall Building, Suite 104, Wilmington, DE 19810.

13.     Wyndham is the successor entity to Wyndham Worldwide Corporation and retains successor liability for the wrongful acts of its predecessor. Where applicable, references to Wyndham in this Complaint refer also to Wyndham Worldwide Corporation.

### IV.    PRELIMINARY MATTERS

14.     All conditions precedent to the filing of this lawsuit have been performed or have occurred. Fed. R. Civ. P. 9 (c).

15.     This pleading references numerous statutes, regulations, and official documents and acts. In all instances cited in this pleading, the document was legally issued, or the act legally done. Fed. R. Civ. P. 9 (d).

---

[3] Wyndham & Plaintiff A.S., entered into a tolling agreement which ended on March 25, 2023. The tolling agreement provided A.S. the ability to file her claim 20 days after the termination of the tolling agreement.

16.     Special damages are sought in this lawsuit and are described with more particularity in this Complaint. Fed. R. Civ. P. 9 (g).

## V.     SEX TRAFFICKING

17.     Sex trafficking is the use of force, fraud, or coercion to compel an individual to engage in commercial sex acts. Exploitation of a minor for commercial sex is human trafficking regardless of whether any form of force, fraud, or coercion was used.[4]

18.     Sex trafficking is a serious public health problem that negatively affects the well- being of individuals, families, and communities.[5]

19.     There is a well-recognized intersection at which criminal human traffickers intersect with mainstream "chamber of commerce" businesses that facilitate and profit from the underlying criminal venture. Hence, human trafficking is accurately characterized as a criminal venture that depends on mainstream business partners to flourish.[6]

20.     Criminal human traffickers recognize that the success of their enterprises often depends on their association with or use of otherwise legitimate businesses.

## VI.     THE ROLE OF THE HOSPITALITY INDUSTRY IN SEX TRAFFICKING

21.     Hotels and motels are a crucial piece of the infrastructure necessary to facilitate sex trafficking in America. Reliable data reveals that over three fourths of all sex trafficking cases involve hotels.[7] These statistics have been known to the hotel and motel industry for years.

---

[4] The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3). "Coercion" is defined in § 1591(e)(2). *See generally* United States Department of Justice, What is Human Trafficking? link at What is Human Trafficking? Sex trafficking is formally defined by the Trafficking Victims Protection Act of 2000 as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act." https://www.congress.gov/bill/106th-congress/house-bill/3244 See generally United States Centers for Disease Control and Prevention, Sex Trafficking (2021), link at https://www.cdc.gov/violenceprevention/sexualviolence/trafficking.html#:~:text=Sex%20trafficking%20is%20defined%20by,adult%20engage%20in%20commercial%20sex

[5] United States Centers for Disease Control and Prevention, Sex Trafficking (2021), link at CDC-Sex Trafficking

[6] *Id.*

[7] Polaris, Human Trafficking in the Hotel Industry, link at Human Trafficking and Hotels and Motels. Polaris is a reputable anti-trafficking organization and manages the US National Human Trafficking Hotline. Polaris Project.

22.     Hotels are used in a variety of other ways by both traffickers and their victims including recruitment and trafficking operations.[8] Thus, sex trafficking and the sexual exploitation of trafficking victims is a rampant, well-known problem in the hotel industry.[9]

23.     Hotel owners and their staff often have a unique vantage point from which to identify potential human trafficking victims on their properties – as well as the traffickers themselves.[10] For this reason, hotels and their employees recognize the industry is a focal point for adult and child sex trafficking and have for many years.

24.     Unfortunately, the hospitality industry has long been complicit in the proliferation of sex trafficking. Despite the prevalence of victimization at hotels, 94% of Polaris survey  respondents (victims)  disclosed  they  never  received  any  assistance,  concern,  or identification from hotel staff.[11]

25.     Hotels permit traffickers to maintain a semblance of privacy that facilitates their crimes, traffickers secrete their victims in publicly accessible venues and impede the victim's ability to escape, all the while making the prey accessible to "Johns" who pay for commercial sex.[12]

26.     Moreover, hotels and motels offer anonymity making hotels a top venue for the crime.[13] In short, hotels present a desirable scenario for these criminal enterprises.

## VII.     COMBATTING SEX TRAFFICKING

---

[8] On- Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking – Hotels and Motels, The Polaris Project, link at On-Ramps, Intersections, and Exit Routes.
[9] *See generally generally* United States Department of Homeland Security, Blue Campaign-Human Trafficking and the Hospitality Industry, link at Human Trafficking and the Hospitality Industry; Forbes, Cracking The $150 Billion Business Of Human Trafficking, link at The $150 Billion Business Of Human Trafficking,
[10] *Id.* page 26.
[11] *Id.* page 23.
[12] Human Trafficking and the Hospitality Industry, United States Department of Homeland Security – Blue Campaign, link at Human Trafficking and the Hospitality Industry; see also A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking, The Polaris Project (2020), link at A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking.
[13] Cavagnaro, G. L. C. (2017). Sex trafficking: The hospitality industry's role and responsibility. Available from Cornell University, School of Hotel Administration site: Sex trafficking: The hospitality industry's role and responsibility.

27.    The most effective weapon against sexual exploitation and human trafficking is education and training.[14] It is important for staff in the hospitality industry to recognize the signs of human trafficking and be prepared to act if they observe a potential human trafficking situation in their establishment.[15]

28.    It is well-recognized that training is critical to stopping trafficking at hotels and motels.  As ECPAT[16] concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

29.    There are abundant resources available to the hospitality industry that provide effective trafficking recognition and response training.[18] Every hotel – large and small, luxury and modest, urban and rural – has the resources to implement a viable anti-trafficking program. There are virtually unlimited resources available to members of the hospitality industry who seek to implement effective anti-human trafficking polices.

30.    Each of the following organizations offer guidance and recommendations for viable programs in this context:

    a.    United Nations Universal Declaration of Human Rights
    b.    United Nations Global Compact
    c.    United Nations Guiding Principles on Business and Human Rights

---

[14] Polaris-Recognizing Human Trafficking. The first step to combating trafficking is to identify victims so they can be rescued and help bring their perpetrators to justice. DHS Blue Campaign, Human Trafficking Awareness Training, link at Blue Campaign-Awareness Training.

[15] National Human Trafficking Resource Center, Human Trafficking and the Hospitality Industry (2021), link at Human Trafficking and the Hospitality Industry.

[16] ECPAT-USA is the leading anti-child trafficking organization in the United States seeking to end the commercial sexual exploitation of children through awareness, advocacy, policy, and legislation. ECPAT-USA is a member of ECPAT International, a network of organizations in more than 100 countries with one common mission: to eliminate the sexual exploitation of children around the world. https://www.ecpatusa.org/

[17] ECPATUSA-Hotel Training.

[18] Look, listen – and stop! Staff training to identify human trafficking is the first step toward fighting it (2019), link at Look, listen – and stop!

6

    d.  The Code – The Tourism Child-Protection Code of Conduct[19]
    e.  Polaris Project
    f.  National Human Trafficking Resource Center and Hotline
    g.  HHS/ACF Look Beneath the Surface
    h.  BEST - Businesses Ending Slavery & Trafficking
    i.  Sustainable Hospitality Alliance Trafficking Recommendations
    j.  American Hotel Lodging Association Trafficking Recommendations[20]

31.    The leading federal agency in this arena is The United States Department of Homeland Security (DHS) Blue Campaign. The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.[21]

32.    The Blue Campaign recognizes that traffickers have long used the hotel industry for sex trafficking and offers resources for this industry, including an essential list of actions these businesses can take to help stop human trafficking.

33.    The Blue Campaign has produced lists of warning signs of human trafficking for members of the hospitality industry. The DHS remarked: "Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims."[22]

---

[19] G6 and the Motel 6 chain did not adopt The Code until 2019. 2020-g6hospitality.com/combating-human- trafficking: "G6 is committed to working with anti-trafficking and survivor services organizations. In 2019, G6 signed the ECPAT Tourism Child-Protection Code of Conduct (www.thecode.org), which is a joint venture of the tourism and hospitality sectors and ECPAT-USA (www.ecpatusa.org), a leader in advocacy and efforts to shape policy designed to end the commercial sexual exploitation of children."

[20] In January 2021, G6 Hospitality issued a press release: "G6 Hospitality, parent company of the Motel 6 and Studio 6 brands, reaffirms its commitment to raising awareness about human trafficking and supporting the important work being done across industries to end human trafficking. G6 Hospitality is deeply committed to doing our part to end human trafficking in all forms and to helping increase awareness about this global crime," said Rob Palleschi, CEO of G6 Hospitality. "Through enhanced training, continuous education, and ongoing partnerships and advocacy work, we remain committed to working with our franchise partners, the hospitality industry and other businesses to continue to combat human trafficking. G6 Hospitality takes a proactive, zero-tolerance stance on human trafficking and the company is dedicated to ensuring the safety and well-being of our guests, our team members and the communities in which we operate." g6hospitality.com/g6-hospitality-reaffirms-commitment-to-combating-human-trafficking

[21] https://www.dhs.gov/blue-campaign

[22] *Id; see also* Indicators of Human Trafficking, link at Indicators of Human Trafficking

34.     Government watchdogs, philanthropic organizations, and members of the hospitality industry and their consultants have identified well-known "red flags" that should alert the facility to the potential for sex trafficking taking place on the premises.  Sex trafficking "red flags" include the following:

    a.   Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
    b.   Individuals show signs of physical abuse, restraint, and/or confinement.
    c.   Individuals exhibit evidence of verbal threats, emotional abuse, and/or being  treated in a demeaning way.
    d.   Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
    e.   Individuals lack freedom of movement or are constantly monitored.
    f.   Individuals avoid eye contact and interaction with others.
    g.   Individuals have no control over or possession of money or ID.
    h.   Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
    i.   Individuals have few or no personal items—such as no luggage or other bags.
    j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
    k.   A group of girls appears to be traveling with an older female or male.
    l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.[23]

35.     The Blue Campaign also provides specific "signs of human trafficking for housekeeping, maintenance, and room service staff" at hotels and motels.  According to the Blue Campaign: "Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims."

36.     Specific "signs of human trafficking" for housekeeping, maintenance, and room service staff include:

    a.   "Do Not Disturb" sign used constantly.
    b.   Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
    c.   Refusal of cleaning services for multiple days.
    d.   Excessive amounts of cash in a room.
    e.   Smell of bodily fluids and musk.

---

[23] Blue Campaign. One Voice. One Mission. End Human Suffering. Hospitality Toolkit, link at Blue Campaign-Hospitality Toolkit

8

 f. Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.

 g. The same person reserving multiple rooms.

 h. Individuals leaving room infrequently, not at all, or at odd hours.

 i. Children's items or clothing are present but no child registered with the room.

 j. Individuals loitering in hallways or appearing to monitor the area.

 k. Excessive amounts of alcohol or illegal drugs in rooms.

 l. Evidence of pornography.

 m. Minors left alone in room for long periods of time.

 n. Excessive number of people staying in a room.

 o. Extended stay with few or no personal possessions.

 p. Provocative clothing and shoes.

 q. Constant flow of men into a room at all hours.

 r. Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).

 s. Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.[24]

37. There is a distinct list of "red flags" that pertain specifically to "concierge, bellman, front desk, security, and valet staff." These employees are typically the first to see guests when they enter the motel. When checking in or requesting motel amenities, a guest may exhibit behavior indicating human trafficking as follows:

 a. Patrons checking into room appear distressed or injured.

 b. The same person reserving multiple rooms.

 c. Few or no personal items when checking in.

 d. Room paid for with cash or pre-loaded credit card.

 e. Excessive use of hotel computers for adult oriented or sexually explicit websites.

 f. Patrons not forthcoming about full names, home address or vehicle information when registering.

 g. Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).

 h. Patron appears with a minor that he or she did not come with originally.

 i. Rentals of pornography when children are staying in the room.

 j. Individuals dropped off at the hotel or visit repeatedly over a period of time.

 k. Individuals leaving room infrequently, not at all, or at odd hours.

 l. Minor with a patron late night or during school hours (and not on vacation).

 m. Individuals checking into room have no identification.

 n. Room is rented hourly, less than a day, or for long-term stay that does not appear normal.

 o. Patrons request information or access to adult services or sex industry.

 p. Room rented has fewer beds than patrons.

 q. Individuals selling items to or begging from patrons or staff.

 r. Individuals enter/exit through the side or rear entrances, instead of the lobby.

 s. Car in parking lot regularly parked backward, so the license plate is not visible.

---

[24] *Id.*

9

38.    There is yet a fourth category dedicated to providing signs of human trafficking for food and beverage staff, as follows:

   a.   Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
   b.   Patron claims to be an adult although appearance suggests he/she is minor.
   c.   Individuals loitering and soliciting male patrons.
   d.   Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
   e.   Individuals asking staff or patrons for food or money.
   f.   Individuals taking cash or receipts left on tables.

39.    The above policies and warning signs are designed to reduce sex trafficking. These "red flags" compose the standard of corporate behavior in the hospitality industry and were known to industry long before 2012.

40.    Federal government agencies also publish extensive tools for responding to suspected sex trafficking. One compendium is the National Human Trafficking Resource Center "Identifying Victims of Human Trafficking – Fact Sheet."[25] This document acknowledges that responding to sex trafficking requires affirmative action: "It is important to be vigilant and to 'look beneath the surface' in situations that don't seem quite right. One chance encounter could be a victim's best hope for rescue."[26]

41.    Indicators for potential exploitation or sexual abuse of minors have also been compiled by leading anti-trafficking groups such as the National Center for Missing & Exploited Children (NCMEC). The "red flags" for sexual exploitation include both behavioral indicators and physical signs of potential trafficking.[27]

---

[25] United States Department of Health and Human Services, Administration for Children and Families (ACF), Fact Sheet: Identifying Victims of Human Trafficking, link at Identifying Victims of Human Trafficking

[26] Link at Identifying Victims of Human Trafficking. See generally Identifying Victims of Human Trafficking: What to Look for in a Healthcare Setting, link at Identifying Victims of Human Trafficking; U.S. Department of Health & Human Services, Office on Trafficking in Persons, LBS Public Awareness Materials, link at HHS-Identifying Victims of Human Trafficking

[27] NCMEC - The Issues: Child Sex Trafficking, link at https://www.missingkids.org/theissues/trafficking. *See also* Polaris, National Human Trafficking Hotline, link at Recognizing the Signs; Love 146, How To Spot Red Flags If You're At Risk Of Trafficking And Exploitation, link at https://love146.org/red-flags/; Anti-Human Trafficking Intelligence Initiative, Red Flags and Indicators Applicable to Sex Trafficking and Forced Labor, link at Rd Flags and Indicators; Truckers Against Trafficking, Human Trafficking Red Flags, link at Red Flags
Texas Attorney General, Human Trafficking Red Flags, link at Texas Attorney General, Human Trafficking Red Flags

42.    The Office of the Texas Attorney General sponsors guidelines and information on this subject, including a list of "Human Trafficking Red Flags." This document enumerates some of the more prominent warning signs that should give rise to suspicion that an individual may be subject to coercion, force, or otherwise being held against their will.[28]

43.    The hotel and motel industry trade group, the American Hotel and Lodging Association, also advocates prudent anti-trafficking measures. Prior to the end of the trafficking of Jane Doe (AS), the AHLA sponsored an industry statement condemning human trafficking:[29]

**AH&LA STATEMENT ON HUMAN TRAFFICKING**

The lodging industry condemns all forms of human trafficking, including that which has as its purpose the sexual exploitation of men, women or children.

U.S. laws on the state and federal level make such activity a crime and apply to all businesses and persons within their jurisdiction, including lodging. establishments. Moreover, lodging establishments are often subject to licensing requirements which prohibit the knowing use of their premises for illegal or immoral purposes. All employees are expected to comply and are encouraged to alert the authorities if there is suspected trafficking in their hotel.

44.    The Department of Homeland Security urges businesses – such as the Days Inn chain– to utilize the free educational services offered by the Blue Campaign to help "identify victims of human trafficking by raising general awareness and encouraging the public to report suspected instances of human trafficking."[30]

45.    Hence, prior to the end of the trafficking of Jane Doe (AS) in 2012, there were reliable, established industry standards for combatting human trafficking. The hospitality industry in general, and Wyndham in particular, knew of the need to adopt and enforce meaningful anti-trafficking policies and procedures.

46.    It is widely recognized that effective training has a substantial, positive impact on the prevalence and scope of trafficking.[31] According to the American Hotel Lodging Association: "Hotel

[28] Texas Attorney General, Human Trafficking Red Flags, link at Texas Attorney General, Human Trafficking Red Flags
[29] 2011-AHLA Statement on Human Trafficking. See generally the AHLA Statement on Security, link at 2011- AHLA Statement on Security
[30] 2012-One DHS-The Blue Campaign
[31] United States Department of Homeland Security – Blue Campaign, Hospitality Tool Kit, link at Hospitality Toolkit; *see generally* Roman, Emily, "Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations. Paper 152, link at Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking

11

employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[32]

47.    Thus, when hotels and motels implement viable anti-trafficking measures, provide proper training, and enforce anti-trafficking policies, trafficking is less likely to occur, and victims are more likely to be rescued.[33]

48.    Conversely, when training is not provided and when anti-trafficking policies are not enforced, these insidious criminal ventures will flourish. Motivation for profits is the precursor upon which traffickers depend to ply their trade.

49.    To be truly effective, human trafficking training should be part of an ongoing education and communication program to provide hotel staff with the knowledge and support they environment for all staff and guests.[34]

50.    The foregoing discussion establishes there are long-standing, well-known, viable standards of conduct and corporate operations available to Wyndham to combat sex trafficking. These guidelines were known to members of the hospitality industry prior to the end of the trafficking of Jane Doe (A.S.) in 2012 at the Houston Days Inn. Contemporaneously, Wyndham continued to do business with the traffickers who victimized Jane Doe (A.S.) and profited from that venture. Thus, the Wyndham Defendants are liable for a violation of the federal anti-trafficking statute.

## VIII.    ALLEGATIONS SPECIFIC TO DEFENDANT WYNDHAM

---

[32] American Hotel Lodging Association, No Room For Trafficking, link at AHLA-Human Trafficking

[33] ECPAT reports that, of hotel employees who receive training on sex trafficking, 84% have increased awareness of these events compared with 16% of untrained employees. See ECPATUSA-No Vacancy. See also Sex Trafficking in the Tourism Industry, J. Tourism Hospit. 2015, link at Sex Trafficking in the Tourism Industry; Roman, Emily, "Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking" (2019). Digital Commons @ ACU, Electronic Theses and Dissertations. Paper 152, link at Evaluating the Impact of Training Employees to Identify Victims of Human Trafficking

[34] Five Ways Human Trafficking Training Can Help Hotels Increase Awareness and Prevention (2020), link at Five Ways Human Trafficking Training Can Help Hotels Increase Awareness and Prevention

51.    Wyndham owns, supervises, manages, controls, and/or operates the Days Inn located at 10137 North Fwy, Houston, TX 77037 ("Houston Days Inn").

    a.  Days Inn by Wyndham is a Wyndham Hotel & Resorts, Inc. brand property.

    b.  Defendant Wyndham is the principal in an agency relationship with the Houston Days Inn. It is both directly and vicariously liable for the acts and/or omissions of the staff at its branded hotels, including the Houston Days Inn where Jane Doe (A.S.) was trafficked. The Houston Days Inn also has apparent agency for Wyndham so as to establish vicarious liability, in addition to an actual agency relationship.

    c.  Wyndham ratified the actions and inactions of the Houston Days Inn.

    d.  Wyndham knowingly benefited, or received something of value, from its commercial business venture at the Houston Days Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Jane Doe (A.S.) was trafficked, as well as in maintaining a positive public image for the Days Inn brand.

    e.  Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in Texas, including through the operation of numerous hotels in Texas, such as Houston Days Inn, contracting to supply services in Texas. Wyndham has derived substantial revenue from services rendered in Texas, has caused injuries to Jane Doe (A.S.) in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell Jane Doe (A.S.) for commercial sex at the Houston Days Inn in Texas.

52.    Defendant Wyndham has consistently signified that they have taken timely and prudent steps to adopt, maintain, and enforce policies to ensure the highest level of quality and service, respect, trust, customer service, ethical behavior, accountability, and integrity. This

representation is demonstrably false as more fully elucidated in this Complaint.

53.     There are well-established standards of corporate operations that are applicable to members of the hospitality industry and that describe effective measure that may be utilized to prevent or minimize human trafficking.

54.     Wyndham failed to adopt, implement, and enforce standards and codes of conduct designed to prevent sex trafficking at their motels. Wyndham had no programs in place as of 2008-2012 for the protection of victims such as Jane Doe (A.S.). Instead, Wyndham continued to focus on business as usual by renting rooms and making profits, all the while permitting traffickers to conduct business while Wyndham and its employees knew or should have known the business underway was the trafficking of humans, including Jane Doe (A.S.).

55.     Thus, the evidence in the case at bar will show that the Defendant breached a solemn responsibility and knowingly benefitted from participation in a venture that Defendant knew or should have known was engaged in trafficking.

56.     The direct result of the foregoing failures was that Jane Doe (A.S.) was subjected to horrendous trafficking behavior at the Houston Days Inn from 2008-2012. The harm to Jane Doe (A.S.) more likely than not would have been eliminated or minimized if proper operating standards and policies were in place at the Houston Days Inn.

## IX.    JANE DOE (A.S.)

57.     From 2008-2012 Jane Doe (AS) was trafficked by an individual man in his late thirties.

58.     Jane Doe (A.S.) had just moved to Houston with her kid's father. He became addicted to drugs so she kicked him out and was living alone. A.S.'s trafficker got to know Jane Doe (A.S.) and he knew about her financial situation and told her she should send her kids home. The trafficker started becoming abusive and told Jane Doe (A.S.) that they needed money for rent and

14

food and that selling herself for commercial sex was how she had to do it. The trafficker found customers for Jane Doe (A.S.) through word of mouth and required her to see every customer that wanted to see her whether she wanted to or not. For the next four years, the trafficker trafficked Jane Doe (A.S.), forcing her into commercial sex while the trafficker controlled Doe's actions, her money, and her freedom.

59.    During the period of her trafficking, Jane Doe's (A.S.) trafficker would beat her if she didn't make enough money. One time he punched her in the head so hard she had to go to the hospital. Her trafficker said he would always beat her face so she couldn't go work at the clubs. He raped her and sodomized her. He threatened to kill her and beat her. Her trafficker had other individuals that worked under him that were always around to keep an eye on Jane Doe (A.S.).

60.    Thus, from the period of 2008-2012, Jane Doe (AS) was subjected to force, fraud, or coercion to engage in commercial sex acts without her consent. The money paid by "Johns" was kept by her trafficker. This criminal conduct continued until Doe was able to escape and seek shelter in a Women's Domestic Violence shelter.

61.    In 2008, Jane Doe (AS) was forcibly taken to the Days Inn located at 37 North Fwy, Houston, TX 77037. This is a Wyndham branded location. Doe was taken to this motel by her trafficker through the use of force, fraud, or coercion.

62.    The Houston Days Inn is in a recognized trafficking area. Her trafficker was a "pimp" with many girls in the area and frequented Houston the Days Inn. The staff knew or should have known that the trafficker's purpose in being present at the Houston Days Inn was to traffick women into forced commercial sex.

63.    Jane Doe (AS) was given the same room each time that her and her trafficker, stayed at the Houston Days Inn. Her trafficker generally checked in under his name and Jane Doe (AS) recalls that on one occasion she checked in because her trafficker didn't have his ID.

15

64.     Plaintiff Jane Doe (AS) recalls a specific occasion where she overdosed when her pimp gave her too many pills and she started seizing. He took her through the lobby back to the room to put her in cold water. Another time her and her pimp got into a fight at the hotel and he threw a bottle at her head so hard she had to go to the hospital. These events are just a few examples of the many occasions where hotel employees would have witnessed Jane Doe (AS) under duress and the control of her trafficker.

65.     The Houston Days Inn employees assisted, supported, and facilitated the trafficking of Jane Doe (AS) in multiple ways, including:

- The Days Inn employees and knew A.S.'s traffickers purpose in being present at the Houston Days Inn was to force women into commercial sex and permitted the trafficker to remain on the premises.
- The Days Inn employees rented rooms to her trafficker when it was obvious compelled commercial sex was taking place.
- The Days Inn employees ignored obvious red flags of trafficking as more fully detailed in this pleading.
- The Days Inn employees permitted numerous "Johns" to enter the rooms in which Jane Doe (AS) was being held for purposes of forced commercial sex.
- The Days Inn employees failed to report the crime of human trafficking of Jane Doe (AS).
- The Days Inn employees failed to do anything to protect or help the two trafficking victims.
- The Days Inn employees provided standard services to the traffickers including housekeeping, towels, and incidental services.

66.     Over the period from 2008-2012, Jane Doe (AS) was forced to engage in commercial sex acts, was subjected to coercion, and suffered serious harm at the hands of her trafficker.

67.     The criminal acts perpetrated on Jane Doe (AS) violated the federal anti-trafficking laws, as more fully explained throughout this Complaint.

68.     Jane Doe (AS) was present at the Houston Days Inn on more than one occasion

16

between 2008 and 2012. Jane Doe (AS) was a "person" who was recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited by other "persons."

69.       Defendants owned, operated, and controlled the location where Jane Doe (AS) was trafficked. Contemporaneously, Doe (AS) was subjected to force, threats of force, fraud, coercion, or any combination of such means that caused her to engage in commercial sex acts while at the Houston Days Inn.

70.       During the time period from 2008-2012, there were abundant "red flags" that alerted Defendant Wyndham that Jane Doe (AS) was being trafficked.  Among others, the following indicators of sex trafficking occurred in connection with Jane Doe (AS)'s trafficking:

a.   Jane Doe (AS) showed signs of fear, anxiety, tension, submission, and/or nervousness with this behavior taking place in the presence of Days Inn personnel.

b.   Jane Doe (AS) showed signs of physical abuse, restraint, and/or confinement, all of which were evident to Days Inn personnel.

c.   Jane Doe (AS) showed signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior while in the presence of Days Inn personnel.

d.   Jane Doe (AS) lacked freedom of movement or was constantly monitored, which conduct occurred while in the presence of Days Inn personnel.

e.   Jane Doe (AS) appeared with a significantly older "boyfriend" – while in the presence of Days Inn personnel.

17

f.  Jane Doe (AS) appeared distressed while in the presence of Days Inn personnel.

g.  The rooms at the subject Days Inn were paid for with cash or a pre-loaded credit card with these transactions being conducted with the assistance, support, and facilitation of Days Inn personnel.

h.  Individuals were dropped off at the subject Days Inn or visited the facility repeatedly over a period of time, with this conduct taking place in the presence of Days Inn personnel.

i.  There were individuals leaving the room in which Jane Doe (AS) was held infrequently, not at all, or at odd hours, with this conduct taking place in the presence of Days Inn personnel.

j.  Jane Doe (AS) and/or one or more individuals who checked in with Jane Doe (AS) had no identification, with this conduct taking place in the presence of Days Inn personnel.

k.  The room(s) in which Jane Doe (AS) was held were rented hourly, less than a day, or for long term stays that did not appear normal with these transactions being conducted with the assistance, support, and facilitation of Days Inn personnel.

l.  The "Do Not Disturb" sign was used constantly, with this conduct taking place in the presence of Days Inn personnel.

m.  Jane Doe (AS)'s traffickers requested room or housekeeping services (additional towels, new linens, etc.), but denied motel personnel entry into the room, with this conduct taking place in the presence of Days Inn personnel.

n.  Motel staff cleaning services were refused for multiple days, with this conduct taking place in the presence of Days Inn personnel.

o.  The room(s) in which Jane Doe (AS) was held smelled of body fluids and musk, which was evident from the public hallway, with this conduct taking place in the presence of Days Inn personnel.

p.  There were individuals loitering in the hallways or appearing to monitor the area in the vicinity of the room(s) in which Jane Doe (AS) was held, with this conduct taking place in the presence of Days Inn personnel.

q.  There were excessive amounts of alcohol or drugs in the room(s) in which Jane Doe (AS) was held, which was visible from the public hallway, with this conduct taking place in the presence of Days Inn personnel.

r.  Jane Doe (AS) was subjected to extended stays at the Houston Days Inn with few or no personal possessions, with this conduct taking place in the presence of Days Inn personnel.

18

s.  There was a constant flow of men into the room(s) in which Jane Doe (AS) was held, with this conduct taking place in the presence of Days Inn personnel.

Based on the foregoing, Jane Doe (AS) contends that the Defendant had knowledge of facts that trafficking was occurring at the Houston Days Inn between 2008-2012; Days Inn personnel knowingly assisted, supported, and facilitated the criminal activity of Jane Doe (AS)'s trafficker.

71.    Defendants additionally benefitted financially and otherwise from their participation in the venture that trafficked Jane Doe (AS) in ways ranging from securing profits from the rental of rooms and other on-site sales on one hand and to enhancing profits from the collection, sale and/or manipulation of customer data on the other. Additionally, Wyndham's brand/goodwill is of significant importance to Wyndham as evidenced by the fact that Wyndham touts its unwavering commitment to brand positioning. Brand/goodwill is generally understood to mean the advantages that accrue to a business on account of its name, location, reputation, and success.

72.    Although it is intangible, it is an integral part of a business.[35] By participating in the venture that trafficked Jane Doe (AS), which participation included not reporting, minimizing and generally ignoring trafficking at the Days Inn, Wyndham was able to maintain and enhance its brand/goodwill, which it clearly considered a financial benefit.

73.    Wyndham participated in a venture and knowingly benefitted from that participation. Hence, Defendant is guilty of violating the federal anti- trafficking laws.

74.    Jane Doe (AS) suffered immediate, permanent, and substantial harm as a result of the atrocities committed against her. She suffered personal injuries and physical harm as well

---

[35] See *Orbison v. Ma-Tex Rope Co.*, Inc., 553 S.W.3d 17, 29 (Tex. App.—Texarkana 2018, pet. denied) (citations omitted).

as mental anguish, emotional trauma, and psychological abuse, all of which is the responsibility of Defendant and their criminal venturers. Jane Doe (AS) will, in all likelihood, continue to suffer from these traumas for the remainder of her life.

## X. CAUSE OF ACTION
### VIOLATION OF THE TVPRA

75. Jane Doe (AS) incorporates all other allegations in supplementation of the cause of action alleged as relevant and applicable.

76. The civil remedy provision of the federal human trafficking statute is found at 28 U.S.C. § 1595:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

77. The Defendant knowingly benefited from participating in a venture which they knew or should have known was engaged in illegal sex trafficking in violation of the TVPRA, 18 U.S.C. § 1591(a)(2) by, *inter alia*, engaging in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of the Plaintiff for commercial sexual exploitation. Defendant knew that their repeated failures to address known risks of human trafficking on their hotel properties would increase the overall volume of illegal commercial sexual exploitation and victimization at their hotel properties. Defendant knowingly benefited from facilitating the trafficking of persons on the motel properties. Jane Doe (AS) sustained irreparable harm as a result of these violations.

78. First, Defendants knowingly benefitted, by receiving financial and other things of value, through their participation in the venture that trafficked Jane Doe (AS) at the Houston Days Inn.

20

79.      Wyndham received financial and other benefits from Jane Doe (AS)'s traffickers including, but not limited to, motel room rental fees, fees other than for room rentals, the sale of condoms to "Johns," and other ancillary fees and/or sales from the operation of the subject hotel. The Houston Days Inn benefitted financially from the presence of Jane Doe (AS)'s sex traffickers using the Days Inn facilities.

80.      Second, Defendants were participants in a venture that ultimately trafficked Jane Doe (AS). The federal sex trafficking statute defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(6). The Houston Days Inn and its employees were associated in fact with Jane Doe (AS)'s trafficker during the time period from 2008-20012.

81.      As provided by the federal anti-trafficking statute, "participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of" section 1591. Plaintiff alleges that Wyndham and the employees at the Houston Days Inn assisted, supported, and facilitated a venture that resulted in her trafficking as more fully outlined in this pleading.

82.      The venture between Wyndham and Jane Doe (AS)'s trafficker was an undertaking or enterprise involving risk and potential profit – risk due to the criminal nature of the conduct taking place at the Houston Days Inn and profits flowing from the use of the motel by the venture.

83.      The Defendant took affirmative, overt actions in furtherance of the venture by continually renting rooms to Jane Doe (AS)'s trafficker, providing motel services to the venture including condoms, shielding the trafficker from detection, accommodating requests by the trafficker when the requests should have alerted on-site staff of ongoing trafficking, and failing to adopt and enforce reasonable and prudent anti-trafficking policies, all the while ignoring the

21

obvious signs of Jane Doe (AS)'s trafficking.

84.    Thus, it is alleged and will be shown at trial that Defendant did knowingly assist, support, or facilitate a violation of the federal human trafficking statute, 18 U.S.C. § 1591 (a)(1), by Jane Doe (AS)'s trafficker.

85.    Jane Doe (AS) is a victim of trafficking under 18 U.S.C. § 1591. Thus, Plaintiff alleges that the venture consisting of Wyndham and the criminal trafficker violated the federal sex trafficking statute, which gives rise to civil liability as to all participants in this venture – including Defendant.

86.    Third, Defendant, including the personnel who worked at the Houston Days Inn, knew or should have known that trafficking was occurring on their property.

87.    Prior to the end of Jane Doe (AS)'s trafficking in 2012, Wyndham and its employees at the Houston Days Inn knew that human trafficking took place at Days Inn facilities across the Nation and specifically at the Houston Days Inn.

88.    Unfortunately, Wyndham and the Houston Days Inn took no steps, had no policies, and enforced no requirements for combating human trafficking. Wyndham failed to educate its employees or adopt and enforce any meaningful anti-trafficking polices despite the fact that these actions were customary and essential in the hospitality industry for the protection of patrons and guests.

89.    Moreover, Defendant (and their predecessors) failed to adopt, implement, or enforce operational rules, policies, procedures, or programs intended to minimize or prevent human trafficking, solicitation, prostitution, escorts, or commercial sex at the Houston Days Inn specifically or at Days Inn properties in general.

90.    Finally, Defendant ignored recommendations from organizations whose primary

purposes include efforts to identify, report, minimize, or prevent human trafficking, solicitation, prostitution, escorts, or commercial sex. Instead, the Houston Days Inn continued to rent rooms to sex traffickers and otherwise assisting, supporting, and facilitating their criminal ventures.

91.     Wyndham took no action to address the risk of trafficking at the Houston Days Inn and instead made their property available to the venture that subdued and trafficked Jane Doe (AS). Thus, both Defendant and the criminal traffickers shared a common purpose: making money. Wyndham profited while Jane Doe (AS)'s trafficker were able to rent rooms in which they forced Jane Doe (AS) to engage in commercial sex.

92.     During the time period of 2008-2012, there was a continuous business relationship between the traffickers and the Houston Days Inn such that it would appear that the traffickers and the hotel had established a pattern of conduct or could be said to have a tacit agreement, thereby establishing constructive knowledge on the part of Wyndham that trafficking was ongoing at the Houston Days Inn.

93.     It is alleged, therefore, that Wyndham had notice of a venture that ultimately trafficked Jane Doe (AS). Thus, Defendants are guilty of "participation in a venture" as that terminology is employed in the TVPRA.

94.     A corporation like Wyndham cannot escape the reach of the federal anti-trafficking statutes "by deliberately shielding themselves from clear evidence of critical facts" that human trafficking is occurring at their facility. "Defendants who behave in this manner are just as culpable as those who have actual knowledge."[36]

95.     It is the independent conduct of G6 in knowingly assisting, supporting, and facilitating the venture that trafficked Jane Doe (AS) that gives rise to liability under section 1595.

---

[36] *Honeycutt v. United States*, 137 S, Ct. 1626 (2017), quoting *McDermott, Inc.* v. *AmClyde*, 511 U. S. 202, 220–221 (1994).

96.     The conduct of the Days Inn Defendants and their violations of the Trafficking Victims Protection Act and its reauthorization amendments were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (AS).

## XI.     **JOINT AND SEVERAL LIABILITY**

97.     "A creature of tort law, joint and several liability 'applies when there has been a judgment against multiple defendants."[37] If two or more defendants jointly cause harm, each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount.[38]

98.     Under traditional tort law, a plaintiff obtaining a judgment against more than one concurrent tortfeasor may satisfy it against any one of them. A concurrent tortfeasor generally may seek contribution from another, but he is not relieved from liability for the entire damages.[39]

99.     Thus, Plaintiff alleges that, under federal law, the Defendants are jointly and severally liable, and none of the tortfeasors are relieved from liability simply because another tortfeasor also committed liability-causing actions, nor are the damages against a tortfeasor diminished to its proportion of fault.[40]

100.     Plaintiff alleges that Defendants acted intentionally and knowingly in their participation in the venture that held Jane Doe (AS), which compels the application of joint and several liability.

101.     Hence, it should follow that all tortfeasors who are found guilty of trafficking Jane

---

[37] See Restatement (Second) of Torts §875 (1977)." *Honeycutt v. United States*, 581 U. S. _____, 137 S. Ct. 1626 (2017).
[38] *See generally Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S. Ct. 2753, 61 L. Ed. 2d 521 (1979).
[39] *See generally Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S. Ct. 2753, 61 L. Ed. 2d 521 (1979).
[40] *See generally Manganiello v. City of New York*, No. 07 Civ. 3644, 2008 WL 2358922 (S.D.N.Y. June 10, 2008), affirmed, 612 F.3d 149 (2nd Cir. 2010).

24

Doe (AS) should likewise be required to produce evidence upon which to base an allocation of damages sustained by a trafficking victim.

## XII.    DAMAGES

102.     Jane Doe (AS) incorporates all other allegations in supplementation of the cause of action alleged as relevant and applicable.

103.     Plaintiff prays for all damages recoverable under the law including actual damages: physical pain, mental anguish, disfigurement, physical impairment, medical expenses, loss of consortium, and loss of services.

104.     Plaintiff seeks the award of exemplary damages against Defendant as recoverable under federal law.  The conduct of the named Defendant evidences, first, intentional misconduct on the part of the managerial level employees at the Houston Days Inn in from 2008-2012, which proximately caused damages to Jane Doe (AS).  Moreover, the failure of Defendant to adopt and enforce effective anti-trafficking policies and educational requirements reveals a reckless indifference and conscious disregard toward patrons and guests of Days Inn facilities in general and of the Houston Days Inn in particular.  Thus, Plaintiff seek recovery of punitive damages that are proportionate to the conduct of the offending parties and the facts of this case, reasonably related to the harm the plaintiff suffered, and in response to reprehensible conduct of the nature of which the Defendant is guilty. Plaintiff also seeks recovery of costs of court and attorneys' fees to the extent permissible under federal law.

105.     Plaintiff also requests that the Court award pre-judgment and post-judgment interest in accordance with the prevailing rates of interest under federal law.

## XIII.  JURY DEMAND

106.     In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

hereby makes application for a jury trial and requests that this cause be set on the Court's Jury Docket. In support of their application, the appropriate jury fee has been paid to the clerk.

## XIV. **Prayer**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause judgment be entered for Plaintiff against the Defendant jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document has been served on counsel of record pursuant to the Federal Rules of Civil Procedure on April 14, 2023.

Respectfully submitted,



By:     /s/ *Kenneth T. Fibich*
    Kenneth T. Fibich
    Texas Bar No.: 06952600
    tfibich@fibichlaw.com
    Sara J. Fendia
    Texas Bar No. 06898800
    sfendia@fibichlaw.com
    1150 Bissonnet Street
    Houston, Texas 77005
    713-751-0025 (Telephone)
    713-751-0030 (Facsimile)

    Steven C. Babin (*Pro Hac Vice forthcoming*)
    Jennifer J. El-Kadi (*Pro Hac Vice forthcoming*)

26

Babin Law, LLC
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /

**ATTORNEYS FOR PLAINTIF**

27

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lorena DiBello on behalf of Kenneth Fibich
Bar No. 6952600
ldibello@fibichlaw.com
Envelope ID: 74679254
Filing Code Description: Petition
Filing Description: Original Petition
Status as of 4/17/2023 8:08 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Russell S.Briggs | | rbriggs@fibichlaw.com | 4/14/2023 4:59:18 PM | SENT |
| Lorena DiBello | | ldibello@fibichlaw.com | 4/14/2023 4:59:18 PM | SENT |
| Kenneth Fibich | 6952600 | tfibich@fibichlaw.com | 4/14/2023 4:59:18 PM | SENT |